1
2
3
4
5
6

### UNITED STATES DISTRICT COURT

### EASTERN DISTRICT OF CALIFORNIA

7
8
9
10
11
12
13
14

| | |
|---|---|
| **GERALD AVILA, an individual; TOM SOUZA, an individual; on behalf of themselves and all others similarly situated,**<br><br>        **Plaintiff,**<br><br>    **v.**<br><br>**TURLOCK IRRIGATION DISTRICT, a California Public Agency, and DOES 1 through 10, inclusive,**<br><br>        **Defendant.** | **1:06-CV-00050 OWW/SMS**<br><br>**ORDER RE: DEFENDANTS MOTION FOR SUMMARY JUDGMENT** |

15
16
17
18
19
20
21
22
23
24
25
26
27
28

## 1.  <u>INTRODUCTION</u>

This lawsuit concerns a dispute between Plaintiffs and the Turlock Irrigation District ("TID") over alleged unpaid overtime wages under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. section 201, *et seq*.  Plaintiffs Gerald Avila ("Avila") and Tom Souza ("Souza") filed this lawsuit as individuals and on behalf of a class of similarly situated employees at TID.  (*See* Complaint, Doc. 1 Complaint, Filed January 17, 2006.)  Before the court for decision is TID's motion for summary judgment.  (Doc. 12, Motion for Summary Judgment, or in the alternative, Summary Adjudication, Filed July 12, 2006.)  TID seeks summary judgment on the entire complaint on the grounds that the FLSA exemption provided by 29 U.S.C. section 213(b)(12) prevents Plaintiffs from

being entitled to overtime pay under the statute.

## 2.  **PROCEDURAL BACKGROUND**

Plaintiffs filed their complaint on January 17, 2006. (Doc. 1, Complaint.)  On July 12, 2006 TID filed a motion for summary judgment or, in the alternative, summary adjudication.  (Doc. 12, Motion for Summary Judgment, or in the alternative, Summary Adjudication.)  In support of their motion, TID included several declarations from TID staff.[1]  Plaintiffs opposed TID's motion. (Doc. 18, Opposition to Defendant's Motion for Summary Judgment, Filed July 31, 2006.)  TID filed a reply brief with declarations by TID staff in support of the motion.[2]  Defendants also filed a request for judicial notice.  (Doc. 14-1, Defendant Request for Judicial Notice, Filed July 12, 2006.)

## 3. **FACTUAL BACKGROUND**

### A.   **Undisputed Facts**

#### i.   **The Turlock Irrigation District**

The TID is a non profit public agency and political subdivision of the State of California.  (DSUF, No. 2)

#### ii.   **Souza's and Avila's Duties In Connection with Irrigation at TID**

Gerald Avila ("Avila") has been a Power Control Center

---

[1] Doc 15, Declaration of Esteban Martinez in Support of MSJ, filed July 12, 2006.; Doc. 16, Declaration of Michael Kavarian in Support of MSJ, filed July 12, 2006.

[2] Doc. 29 Declaration of Casey Hashimoto in Support of MSJ, filed August 7, 2006.; Doc. 30, Supplemental Declaration of Esteban Martinez in Support of MSJ, filed August 7, 2006; Doc. 31, Declaration of Martin Purdy in Support of MSJ, filed August 7, 2006.

Operator ("PCCO") with TID for 26 years.  (Doc. 19-1, Declaration of Gerald Avila, Paras. 1 and 7, Filed July 31, 2006.)  Tom Souza has been a PCCO with TID for 8 years.  (Doc. 20-2, Declaration of Tom Souza, Paras. 1 and 7, Filed July 31, 2006.)

As PCCOs, Souza and Avila change water flows to control the generation of electricity for the power grid.  (PSDF, No. 7) Once the Water Resources Administration ("WRA") determines the amount of water needed, it contacts a PCCO on duty, who adjusts the water flow according to the WRA's directive.  (PSDF, No. 15) The level of water discharge required by the WRA is achieved by raising the electrical output of the generators, a byproduct of which is additional water flow.  (PSDF, No. 16)

**B.   Disputed Facts**

**i.   The Turlock Irrigation District**

TID's electrical service area covers part of Stanislaus, Merced, Mariposa, and Tuolomne counties and the cities of Ceres, Turlock, Keyes, Denair, Hughson, Hickman, La Grange, South Modesto, Delhi, Hilmar, Patterson, Crows Landing, Diablo, Grande, and Del Puerto Canyon.  (PSDF, No. 1)

According to TID, more than 90 percent of the water stored and ultimately delivered by the TID in 2002, 2003, 2004, and 2005 was delivered for agricultural purposes.  (DSUF, No. 3) Plaintiffs dispute this on the ground that they have not had the opportunity to conduct discovery in this case and therefore do not possess sufficient evidence regarding this issue.  (Doc. 21, Plaintiffs Separate Statement of Facts in Opp. To Defendant's MSJ at Para. 3, filed July 31, 2006)

The official prescheduled irrigation season begins March

**3**

15th and ends October 15th every year. (PSDF, No. 27)  To
Souza's and Avila's knowledge, water from the TID distribution
canal system is not used for agricultural purposes during the off
season. (PSDF, No. 28)  To Souza's and Avila's knowledge, water
from the TID distribution canal system flows down the Tuolomne
River into the Pacific Ocean during the off season. (PSDF, No.
29)

### ii.  Training Requirements for PCCOs and Assistant Power Control Center Operators ("APCCOs")

In order to competently perform their job duties, both Souza
and Avila must have completed on-the-job training and obtained a
license from the North American Electric Reliability Council
("NERC") license. (PSDF, No. 21)  NERC's mission is to ensure
that the bulk electric system in North America is reliable,
adequate, and secure. (PSDF, No. 22)  NERC sets standards for
the reliable operation and planning of the bulk electric system.
(PSDF, No. 23)  NERC also monitors, assesses and enforces
compliance with reliability standards. (PSDF, No. 24)  NERC
requires a proctored examination for certification and requires
at least 160 hours of continuing education every three years.
(PSDF, Nos. 25-26).

### iii. The Duties of PCCOs and APCCOs

#### a.  Duties Related to Electrical and Gas Powered Generation

TID argues that PCCOs and APCCOs are employed by TID in
connection with the operation of canals, reservoirs, and
waterways used for the supply of storing water. (DSUF, No. 1)
Plaintiffs, on the other hand, argue that PCCOs and APCCOs work
in connection with the generation, distribution, and transmission

**4**

of electricity.  (Doc. 21, Plaintiffs Separate Statement of Facts in Opp. To Defendant's MSJ, Para. 1, filed July 31, 2006).  Plaintiffs state that as PCCOs, the primary duty of Souza and Avila is monitoring electrical power generation, transmission and distribution systems through the use of the Energy Management System ("EMS") in the TID Control Area.  (PSDF, No. 2)

To operate and monitor the TID Control Area, Souza and Avila monitor information from schematics, alarms, and telemetry in order to enable the correct amount of power to be generated and transmitted.  (PSDF, No. 3)  Souza and Avila provide no facts to indicate what the power is generated for.  Souza and Avila use the Energy Management System ("EMS") to remotely operate the generators, transformers, capacitors, and circuit breakers, which control electrical power flow.  (PSDF, No. 4)  On occasion, Souza and Avila respond to customer inquiries about power outages.  (PSDF, No. 5)

Souza and Avila monitor the electrical power flow from TID-owned generators.  (PSDF, No. 6)  They also control the power from six gas powered generators: 3 units that generate a total of 250 megawatts ("MW"), 2 units that generate 25 MW each and one 50 MW unit.  (PSDF, No. 9)  These gas generators generate a total of 350 MW.  (PSDF, No. 10)

On average, Souza devotes more than 90 percent of his work time to monitoring the generation, transmission and distribution of electricity.  (PSDF, No. 19) On average, Avila devotes more than 90 percent of his work time to monitoring the generation, transmission and distribution of electricity.  (PSDF, No. 20)
//

**5**

### b. Duties Beyond the Scope of Souza and Avila's Job Description

Souza and Avila have no discretion as to when the water flow is changed or how much it is changed. (PSDF, No. 8)  Neither Souza nor Avila has the responsibility or authority to determine when to discharge water into the District's canal system to meet the demands of the District's water customers. (PSDF, No. 13) The WRA, an entity of TID but wholly separate from the Power Control Center, determines when the demands of the District's water customers necessitate additional water flow, and how much additional water is needed. (PSDF, No. 14)

### c. Souza and Avila's Duties in Connection with Irrigation at TID

Souza and Avila control the power from a total of 11 hydro-powered generators: four at the Don Pedro Dam Power Plant (three of which are operated by TID, which produce a total of 148 MW, one is operated by the Modesto Irrigation District), two units at La Grange Dam, which generate a total of 5 MW, one 5 MW generator at Dawson Reservoir, three 1 MW generators at Turlock Lake and two generators which produce a total of 1 MW at the Hickman Power Plant. (PSDF, No. 11.)  The total generation capacity of the hydro powered units controlled by Souza and Avila is 162 MW. (PSDF, No. 12.)

On average, Souza devotes significantly less than ten percent of his work time to tasks tangentially related to the water system. (PSDF, No. 17)  On average, Gerald Avila devotes significantly less than ten percent of his work time to tasks tangentially related to the water system. (PSDF, No. 18)

//

**6**

### C.   Pertinent Facts Not Included By Either Party in their Statement of Disputed and Undisputed Facts.

### i.   The Turlock Irrigation District

TID serves over 5,800 irrigation customers covering approximately 150,000 acres of farmland. (Doc. 16, Kavarian Dec., Para. 3, filed July 12, 2006.)  The Tuolumne River is the source of most of the District's water.  (*Id.*)  In dry years, TID relies on conjunctive use of groundwater pumped into the canal system. (*Id.*)  TID owns and operates more than 250 miles of canals stretching from La Grange Dam on the Tuolumne River to the San Joaquin River.  (*Id.*)

TID's irrigation and water delivery system begins at the District's Upper Main Canal Forebay Gates located at the La Grange Dam.  (Doc. 30, Martinez Supp. Dec., Para. 2.)  The facilities monitored and remotely controlled by the PCCOs and the APCCOs within the Districts irrigation system include the Upper Main Canal at La Grange Dam, Dawson Powerhouse, and Turlock Lake Powerhouse. (*Id.*)

The Upper Main Canal of TID's irrigation system is used exclusively for the delivery of water for irrigation purposes. (Doc. 29, Hashimoto Dec., Para. 3, filed August 7, 2006.)  PCCO's employed by TID remotely operate multiple water release valves, headgates, and forebay gates that regulate the flow of water into and through the Upper Main Canal.[3]  (*Id.*)

By reviewing TID's water receipts, the Supervising Engineering Technician can determine whether the water was

---

[3] A hand drawn diagram of TID was included as an attachment to Hashimoto's Declaration.

ultimately delivered for agricultural or non agricultural purposes. (Doc. 16, Kavarian Dec., Para. 8, filed July 12, 2006.) From 2002 through 2005, more than 90 percent of the water ultimately delivered by TID's water delivery system was for agricultural purposes. (*Id.* at Para. 7) In 2005, TID ultimately delivered 97% of the total water delivered for agricultural purposes; only 3% of the water ultimately delivered by TID in 2005 was for non agricultural purposes. (*Id.* at Para. 14.)

### ii.  Job Description for PCCOs and APCCOs

According to the TID Job Description for PCCOs and APCCOs, under the section of "Job Summary," PCCOs and APCCOs are required to "monitor and coordinate water flows, power scheduling, after hours customer assistance and emergency response." (Doc 15-2, Declaration of Esteban Martinez ("Martinez Dec.") in Support of MSJ, Ex. A and B, filed July 12, 2006.) Under the section "Duties and Responsibilities" PCCOs and APCCOs are required to "operate and monitor the District's water distribution facilities including: operating power plants, water diversion facilities, and canal systems to ensure proper water distribution into the canals and rivers." (*Id.*)

### iii. Duties of PCCOs and APCCOs in Connection with Irrigation at TID

The PCCOs and APCCOs remotely monitor and control several TID facilities. These include the following:

//

//

//

| FACILITY | PCCO AND APCCO DUTIES |
|---|---|
| Don Pedro Power Plant | Monitor reservoir elevation and water releases from the generation plant. Remotely control water releases by adjusting Don Pedro generation |
| La Grange Dam | Monitor reservoir elevation, forebay elevation, TID Upper Main Canal flow, and Tuolomne River flow. Remotely control water diverted into Forebay by adjusting La Grange generation and/or Sluice Gates, and water diverted into TID Upper Main Canal by adjusting the TID Upper Main Canal Forebay Gates. |
| Dawson Powerhouse | Monitor reservoir elevation. Remotely control water releases by adjusting Dawson generation |
| Turlock Lake Powerhouse | Monitor reservoir elevation and TID Main Canal flows. Remotely control water released into TID Main Canal by adjusting Turlock Lake Powerhouse generation. |

(Doc. 30, Martinez Supp. Dec., Para. 3.)

Irrigation requirements and customer demand is the priority for the operation of these hydro-electric facilities under normal conditions. (Doc. 30, Martinez Supp. Dec., Para. 4.) Daily, weekly, monthly, and seasonally irrigation demands are what determine the patterns of generation for those periods. (*Id*.) The small hydroelectric generators along TID's irrigation system are not relied upon as a primary source of electrical generation. Electricity generated by these facilities is a result of the flow of water through the irrigation system. (*Id*.)

PCCOs and APCCOs generally are responsible for the

**9**

continuous operation of TID's electrical and water delivery systems.  (Doc. 30, Martinez Supp. Dec., Para. 4.)  PCCOs and APCCOs are responsible for monitoring and coordinating water flows into TID's irrigation system.  (*Id.*)

Monitoring and coordinating TID's water distribution facilities include remotely operating the District's water diversion facilities and canal systems to ensure proper water distribution into the canals and rivers.  (*Id.* at Para. 5.) Specifically, PCCOs and APCCOs remotely operate the release gages at the La Grange Reservoir in order to adjust the flow and volume of the Tuolumne River, as well as the flow of water out of the La Grange Reservoir.  (*Id.*)

TID alleges that PCCOs and APCCOs have the authority and responsibility to make the decision to divert the flow of water from the La Grange Reservoir to Turlock Lake in order to avoid excess water flows that could result in flooding.  (*Id.* at Para. 6.)  TID also claims that PCCOs and APCCOs have the authority and responsibility to determine when to discharge water into TID's canal system in order to meet the demands of TID's water customers.  (*Id.* at Para. 7.)  Plaintiffs on the other hand argue that they do not have the responsibility or authority to determine when to discharge water into TID's canal system to meet the demands of TID water customers.  (PSDF, No. 13)

### iv.  Revised Job Description of PCCOs

In June 2004, TID and the TID Employee Association ("the Association") met regarding the language of the job description for the PCCOs and APCCOs employed by TID.  (Doc. 31, Purdy Dec., Para. 3, filed August 7, 2006.)  Avila and Souza prepared the

**10**

Association's proposal for a revised job description for PCCOs. (*Id.*)   Included in the job description are the following duties and responsibilities of PCCOs:[4]

| Canal Flows | Operators are responsible for maintaining requested canal flows downstream of Canal Creek, Fairfield, Woodward, and Turlock Lake.  Operators must maintain upstream elevations as specified for Dawson, Frankenheimer, Parker, and Hickman. |
|---|---|
| River Flows | Operators are responsible for maintaining specified Tuolomne River Flows downstream from the La Grange P.P.   The river flows must be monitored constantly.  When the water into the river is in whole or in part being supplied by the La Grange P.P., operators must be able to quickly correct river flows impacted by the unscheduled loss of generation. |
| La Grange Reservoir | 1.   Post Irrigation Season: Operators must constantly monitor the elevation of the water in the La Grange reservoir.  Advance planning is required to assure that the reservoir is filled before shutting down Don Pedro P.P. generation in the winter months when the La Grange P.P. Upper Main Canal is unavailable.<br>2.   Irrigation Season: Great care must be exercised to avoid spilling over the dam, running too much water into the upper canal, and that MID is taking their share of water.<br>3.   Tuolumne River: Power System Operators must constantly maintain the required flow in the Tuolumne River as mandated by the Federal Energy Regulatory Commission (FERC). |
| Turlock Lake Reservoir | Operators must (in coordination with Energy Resources) assure that Turlock Lake Reservoir is kept at the appropriate elevation. |
| Logs | Operators must keep Daily Logs of Activities pertaining to line work, canal flow changes, emergency generator tests, clearances, red tags, breaker operations (start/stop) on generating units, transmission limits on major paths (COI, Path 15, etc.), real-time power purchases and sales, substation maintenance, canal flow change requests, and weather conditions. |

---

[4] This table provides a summary of duties outlined in the actual document.  The information on this chart is limited to the duties relevant to 28 U.S.C. section 213(b)(12).

| Canal Flow Changes | Also logged in a book specifically for tracking canal flow change requests. |
| Real Time Power Scheduling | 1.   Economically schedule water and energy resources<br>2.   Coordinate and evaluate water and energy exchange transfers to determine most economical arrangements. |

(Doc. 31-2, Purdy Dec., filed August 7, 2006.)

### v.   Proposed 3-Level PCCO Job Classification Draft

Avila and Souza also submitted to TID a document entitled "Power System Operator Order of Progression" describing a proposed 3-level job classification for PCCOs at the District. (Doc. 31, Purdy Dec., Para. 4, filed August 7, 2006.)  According to the document, PCCOs should possess the following skills and experience:[5]

//
//
//
//
//
//
//
//
//
//

---

[5] This table provides a summary of knowledge and experience outlined in the actual document.  The information on this chart is limited to the knowledge and experience relevant to 28 U.S.C. section 213(b)(12).

**12**

| | By the end of 12 months | By the end of 24 months |
|---|---|---|
| Technical Knowledge | • Clearances, operations, and safety requirements pertinent to irrigation and water distribution system operations.<br>• Includes Irrigation flow concepts, system forecasting, power scheduling and accounting techniques.<br>• Concepts of the Tuolumne River flow control. | • Clearances, operations, construction, maintenance, safety requirements pertinent to electric power systems, includes electrical and mechanical properties.<br>• Canal & River Flow Controls, and procedures. |

13

| Experience | • Analyze Irrigation Flow Data<br>• Identify irrigation and scheduling problems and implement corrective action.<br>• Develop real time water schedules and forecasts.<br>• Economically schedule Irrigation resources.<br>• Make correct decisions in emergency situations in the irrigation and distribution system.<br>• Operate an irrigation & distribution system and direct work of irrigation & distribution system personnel. | |

(Doc. 31-3, Purdy Dec., filed August 7, 2006.)

Further, according to the document, the skills and experience that APCCOs should possess includes:

| | By the end of 12 months | By the end of 24 months |
|---|---|---|
| Technical Knowledge | • Understand basic generation operations including water management and economic operation. | • Understand basic generation operations including water management and economic operation. |

**14**

| Experience | • Basic understanding of TID, MeID, and SSJID Irrigation Water Systems and their operations. | |

(Doc. 31-3, Purdy Dec., filed August 7, 2006.)

　　　Lastly, during negotiations between TID and the Association, TID received a Memo from Avila and Souza dated April 4, 2005. (Doc. 31, Purdy Dec., Para. 5, filed August 7, 2006.)  Attached to the memo is a chart prepared by Souza and Avila titled "Comparison of Duties Performed by Control Center Operators of Major California Utilities."  (Doc. 31-4, Purdy Dec., filed August 7, 2006.)  This chart purports to show that PCCOs at TID perform more duties than PCCOs in other utility districts including monitoring and controlling river flow (as indicated in column 10 of the chart) and monitoring and operating irrigation systems (as indicated in column 12 of the chart.)  (*Id.*)

### 5.  **STANDARD**

　　　Summary judgment is warranted only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact."  Fed. R. Civ. P. 56(c); *California v. Campbell*, 138 F.3d 772, 780 (9th Cir. 1998). Therefore, to defeat a motion for summary judgment, the non-moving party must show (1) that a genuine factual issue exists and (2) that this factual issue is material.  *Id*.  A genuine issue of fact exists when the non-moving party produces evidence

**15**

on which a reasonable trier of fact could find in its favor

viewing the record as a whole in light of the evidentiary burden

the law places on that party. *See Triton Energy Corp. v. Square

D Co.*, 68 F.3d 1216, 1221 (9th Cir. 1995); *see also Anderson v.

Liberty Lobby, Inc.*, 477 U.S. 242, 252-56 (1986). Facts are

"material" if they "might affect the outcome of the suit under

the governing law." *Campbell*, 138 F.3d at 782 (quoting *Anderson*,

477 U.S. at 248).

The nonmoving party cannot simply rest on its allegations

without any significant probative evidence tending to support the

complaint. *Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir.

2001).

> [T]he plain language of Rule 56(c) mandates the
> entry of summary judgment, after adequate time
> for discovery and upon motion, against a party
> who fails to make a showing sufficient to
> establish the existence of an element essential
> to the party's case, and on which that party
> will bear the burden of proof at trial.  In such
> a situation, there can be "no genuine issue as
> to any material fact," since a complete failure
> of proof concerning an essential element of the
> nonmoving party's case necessarily renders all
> other facts immaterial.

*Celotex Corp. v. Catrell*, 477 U.S. 317, 322-23 (1986).  The more

implausible the claim or defense asserted by the nonmoving party,

the more persuasive its evidence must be to avoid summary

judgment. *See United States ex rel.  Anderson v. N. Telecom,

Inc.*, 52 F.3d 810, 815 (9th Cir. 1996).  Nevertheless, the

evidence must be viewed in a light most favorable to the

nonmoving party. *Anderson*, 477 U.S. at 255.  A court's role on

summary judgment is not to weigh evidence or resolve issues;

rather, it is to determine whether there is a genuine issue for

1   trial.  *See Abdul-Jabbar v. G.M. Corp.*, 85 F.3d 407, 410 (9th

2   Cir. 1996).

### 6.  DISCUSSION

#### A.  TID's Request for Judicial Notice

5       TID requests judicial notice of the Organization Papers of

6   the Turlock Irrigation District, as enacted by the Board of

7   Supervisors of the County of Stanislaus, dated June 6, 1887.

8   (Doc. 14-1, Defendant Request for Judicial Notice, Filed July 12,

9   2006.)  The document in question is a public record and its

10  contents are not reasonably in dispute.   It is therefore

11  appropriately the subject of judicial notice.  See Fed. R. Evid.

12  201(b)(2).

13      TID also requests judicial notice of the fact that TID is a

14  non-profit political subdivision and agency of the State of

15  California, and therefore a public entity.  This fact is not in

16  dispute by either party.

17      TID's request for judicial notice is **GRANTED**.

#### B.  29 U.S.C. section 213(b)(12)

19      FLSA refers to 29 U.S.C. section 213's, highly specific

20  exemptions that apply to overtime wage requirements. 29 U.S.C.

21  section 213(b)(12) exempts:

> "Any employee employed in agriculture or in
> connection with the operation or maintenance
> of ditches, canals, reservoirs, or waterways,
> not owned or operated for profit, or operated
> on a sharecrop basis and which are used
> exclusively for supply and storing of water,
> at least 90 percent of which was ultimately
> delivered for agricultural purposes during
> the preceding calendar year."

27      In order to carry their burden on summary judgment, TID must

28  show that there are no disputed issues of material fact:

**17**

1.   that Plaintiffs are employees in connection with
     the operation or maintenance of ditches, canals,
     reservoirs, or waterways and

2.   that the ditches, canals, reservoirs, or
     waterways, are not owned or operated for profit[6]
     and

3.   that the ditches, canals, reservoirs, or waterways
     are used exclusively for supply and storing of
     water, at least 90 percent of which was ultimately
     delivered for agricultural purposes during the
     preceding calendar year.

### i.  Are Plaintiffs "Employees In Connection With the Operation or Maintenance of Ditches, Canals, Reservoirs, or Waterways"?

In opposition to the motion, Plaintiffs argue that their work is not done "in connection with ditches, canals, reservoirs, and waterways." Plaintiffs argue that the exemption does not apply to them as the work they actually performed entails predominantly electrical generation. Plaintiffs argue that their work with hydroelectric generation is only a small portion of their employment activities and that they spend far more time and effort generating electricity with gas than they do with water. Plaintiffs state that they are also responsible for dealing with transmission and distribution of the electricity generated. Plaintiffs contend that they only spend some time performing exempt tasks, but they routinely and consistently spend all of their time on non exempt tasks unrelated to the irrigation exemption on which TID relies.

Plaintiffs first argue that their case is analogous to *Brennan v. Sugar Cane Growers Cooperative of Florida*, 486 F.2d

---

[6] It is undisputed that TID is not owned or operated for profit as required under the exemption.

**18**

1   1006 (5th Cir. 1972), and ask the court to adopt the rule in

2   *Brennan* that no exemption may be allowed for compensation for

3   employees whose work consists of both exempt and non exempt

4   activity. *Id.* at 1012.  Plaintiffs argue that they are clearly

5   non exempt because they routinely and consistently spend all of

6   their time on non exempt tasks altogether unrelated to the

7   exemption activities on which TID relies.  However, *Brennan* is

8   factually distinguishable. *Brennan* deals with an exemption under

9   section 213(b)(15) which exempts "any employee engaged in the

10  processing of maple sap into sugar (other than refined sugar) or

11  syrup."  This provision does not contain the "in connection with"

12  language of section 213(b)(12).  By comparison, the language of

13  the exemptions 213(b)(12) and 213(b)(15) are not parallel to one

14  another. *Mitchell v. Stinson,* 217 F.2d 210, 214 (1st Cir. 1954).

15  The difference in terminology employed by Congress evinces

16  Congress' intent to make exemptions dependant upon employment by

17  nature of the employer, the capacity of employment, and

18  employment in a particular industry. *See Id.*  The Fifth

19  Circuit's *Brennan* rule recognizes section 213(b)(12)'s purpose

20  would not be served, as distinguished from a non profit

21  irrigation district serving agriculture.[7]

22  ───────────────

23      [7] This reasoning also forecloses Plaintiffs' argument that
    the court adopt the rule in *Wirtz v. Carstedt*, 362 F.2d 67, 69-70
24  (9th Cir. 1966) which states, "The performance of any substantial
    amount of non exempt work in any workweek defeats an otherwise
25  applicable exemption."  *Wirtz* dealt with the interpretation of 29
    U.S.C. section 13(b)(4), an exemption for "any employee employed
26  in the canning, processing, marketing, freezing, curing, storing,
    packing for shipment, or distributing of any kind of fish,
27  shellfish, or other aquatic forms of animal or vegetable life or
    any by product thereof." This rule also does not contain the "in

28

**19**

Plaintiffs next distinguish their case from *Wright v. Salt River Valley Water Users' Association*, 94 Ariz. 318 (1963). Plaintiff was employed by Defendant as a gate operator at the North Gates of Granite Reef Dam.  The court ruled that plaintiff was engaged in the activity of an irrigation worker, a person specifically excluded from coverage under section 213(b)(12).[8] *Id.* at 323.  The court reasoned that Plaintiff's activities in *Wright* were not in the remotest sense related to the generation or distribution of electricity and were solely concerned with impounding and distributing irrigation water for agricultural purposes.  *Id.*  Plaintiffs activities included:

> 1.  Generally of checking the amount of water in the forebay by reading gauges on his side of Granite Reef Dam;
>
> 2.  Mechanically setting the gates which regulated the flow of water into the Arizona Canal;
>
> 3.  Patching leaks under the flash gates on the dam;
>
> 4.  Making several daily telephone reports to Defendant in Pheonix;
>
> 5.  Receiving telephone instructions from defendant with respect to the amount of water to be released into the canal, which instructions were usually given once a day
>
> 6.  Making one or more telephone reports to a co worker or receiving such reports from him
>
> 7.  Greasing machinery every two weeks or so

---

connection with" language.

[8] The language in section 213(b)(12) was actually in section 213(b)(6) in 1963 when the case was decided.

**20**

8. Directing trespassers to leave an area
defined by defendant

*Id.* at 319.

However, *Wright* does not stand for the proposition that an irrigation worker whose duties include both exempt and non exempt activities is not within section 213(b)(12)'s exemption. A plain reading of the statutory language indicates that an employee need only have a connection with the operation or maintenance of ditches, canals, reservoirs, or waterways in his employment.

Further support for this position is found in 29 CFR 780.409 which interprets the section 213(b)(12) exemptions. According to 29 CFR 780.409, for an employee to be exempt, the employment must be employed:

> "in connection with the operation or maintenance" of the named facilities; other employees of the irrigation system, not employed in connection with the named activities, are not exempt. The exemption may apply to employees engaged in insect, rodent, and weed control along the canals and waterways of the irrigation system."

This language indicates that the exemption does not apply only to instances where there is direct involvement in the delivery of water. Plaintiffs are not exempt simply because they are also engaged in non exempt duties involving electrical power operations if the activities facilitate or contribute to operation and maintenance of the irrigation system. Whether or not Plaintiffs' duties are "in connection with the operation or maintenance of ditches, canals, reservoirs, or waterways" in their employment is a fact intensive inquiry to be determined on a case by case basis.

**21**

### a.   Job Duties of Avila and Souza in Connection With Irrigation.

It is undisputed that TID owns and operates a series of canal systems to provide water service to district members who are irrigators.  The first issue is whether Plaintiffs' job duties with TID are "in connection with the operation or maintenance" of TID's canal system.  As explained in *Mitchell v. Stinson*, 217 F.2d 210, 214 (1st Cir. 1954), the language used by Congress in the various exemptions in 29 U.S.C. section 213 is "not parallel," and strongly indicates that Congress intended some exemptions to be broader than others.  According to *Mitchell*, "Congress intended that more than the physical operations of the employee should be considered when it used such language as 'any employee employed in connection with the operation or maintenance of ditches, canals, reservoirs, or waterways...'"  *Mitchell,* 217 F.2d at 214.[9]

Plaintiffs dispute the fact that PCCOs and APCCOs are employed by TID in connection with the operation of canals, reservoirs, and waterways used for the supply of storing water. (DSUF, No. 1)  Plaintiffs argue that PCCOs and APCCOs work in connection with the generation, distribution, and transmission of electricity.  (Doc. 21, Plaintiffs Separate Statement of Facts in Opp. To Defendant's MSJ, Para. 1, filed July 31, 2006.) According to Plaintiffs, their primary duty as PCCOs is

---

[9] Consequently, Plaintiffs' comparison of the irrigation exemption to the "fish processing" exemption in 29 U.S.C. section 213(b)(4) is inapposite to application of the irrigation exemption because section 213(b)(4) (the fish processing exemption) does not include the "in connection with" language found in section 213(b)(12) (the irrigation exemption.)

22

monitoring electrical power generation, transmission and
distribution systems through the use of the EMS in the TID
control area. (PSDF, No. 2)  To operate and monitor the TID
control area, Souza and Avila claim that they monitor information
from schematics, alarms, and telemetry in order to enable the
correct amount of power to be generated and transmitted (PSDF,
No. 3)  Souza and Avila provide no facts to indicate what the
power is generated for.  Souza and Avila claim to use the EMS to
remotely operate the generators, transformers, capacitors, and
circuit breakers, which control the electrical power flow.
(PSDF, No. 4)  They monitor the electrical power flow from TID-
owned generators.  (PSDF, No. 6)  They also control the power
from six gas powered generators: 3 units that generate a total of
250 megawatts ("MW"), 2 units that generate 25 MW each and one 50
MW unit.  (PSDF, No. 9).  These gas generators generate a total
of 350 MW.  (PSDF, No. 10).

However Plaintiffs in this case perform similar activities
to the Plaintiff in *Wright.*  Plaintiffs concede in their separate
statement of disputed facts that, as PCCOs, Souza and Avila
change water flows to control the generation of electricity for
the power grid.  (PSDF, No. 7)  Once the WRA determines the
amount of water needed, it contacts a PCCO on duty, who adjusts
the water flow according to the WRA's directive.  (PSDF, No. 15)
The level of water discharge required by the WRA is achieved by
raising the electrical output of the generators, a by product of
which is additional water flow.  (PSDF, No. 16).

Souza and Avila also control the power from a total of 11
hydro-powered generators: four at the Don Pedro Dam Power Plant

**23**

(three of which are operated by TID, which produce a total of 148 MW, one is operated by the Modesto Irrigation District), two units at La Grange Dam, which generate a total of 5 MW, one 5 MW generator at Dawson Reservoir, three 1 MW generators at Turlock Lake and two generators which produce a total of 1 MW at the Hickman Power Plant.  (PSDF, No. 11.)  The total generation capacity of the hydro powered units controlled by Souza and Avila is 162 MW.  (PSDF, No. 12.)

     An analysis of the record provides further evidence of Souza and Avila's duties.  PCCOs and APCCOs generally are responsible for the continuous operation of TID's electrical and water delivery systems.  (Doc. 30, Martinez Supp. Dec., Para. 4.) PCCOs and APCCOs are responsible for monitoring and coordinating water flows into TID's irrigation system.  (*Id.*)

     The TID job description for PCCOs and APCCOs provides that they are required to "monitor and coordinate water flows, power scheduling, after hours customer assistance and emergency response."  (Doc 15-2, Martinez Dec., Ex. A and B.)  Also, under the section "duties and responsibilities" PCCOs and APCCOs are required to "operate and monitor the District's water distribution facilities including: operating power plants, water diversion facilities, and canal systems to ensure proper water distribution into the canals and rivers."

     In monitoring several of the TID facilities, PCCOs and APCCOs are responsible for the following:

> 1.   To monitor reservoir elevation and water releases from the generation plant at Don Pedro Power Plant.

**24**

2.    To remotely control water releases by
      adjusting Don Pedro generation.

3.    To monitor reservoir elevation, forebay
      elevation, TID Upper Main Canal flow,
      and Tuolomne River flow by operating the
      release gages to adjust the flow and
      volume of the water.

4.    To remotely control water diverted into
      Forebay by adjusting La Grange
      generation... and water diverted into
      TID Upper Main Canal by adjusting the
      TID Upper Main Canal Forebay Gates.

(Doc. 30, Martinez Supp. Dec., Para. 3.)

Plaintiffs dispute TID's claims that PCCOs and APCCOs have

the authority and responsibility to determine when to discharge

water into TID's canal system in order to meet the demands of

TID's water customers.  (*Id.* at Para. 7.)

The record also indicates that in June 2004 Avila and Souza

prepared a proposal for a revised job description for PCCOs.

Included in the job description are the following duties and

responsibilities:

1.    Operators are responsible for
      maintaining requested canal flows
      downstream of Canal Creek, Fairfield,
      Woodward, and Turlock Lake.  Operators
      must maintain upstream elevations as
      specified for Dawson, Frankenheimer,
      Parker, and Hickman.

2.    Operators are responsible for
      maintaining specified Tuolomne River
      Flows downstream from the La Grange P.P.
      The river flows must be monitored
      constantly.  When the water into the
      river is in whole or in part being
      supplied by the La Grange P.P.,
      operators must be able to quickly
      correct river flows impacted by the
      unscheduled loss of generation.

3.    During the Post Irrigation Season,
      Operators must constantly monitor the
      elevation of the water in the La Grange

reservoir.  Advance planning is required
to assure that the reservoir is filled
before shutting down Don Pedro P.P.
generation in the winter months when the
La Grange P.P. Upper Main Canal is
unavailable.

4.    During the Irrigation Season, Great care
must be exercised to avoid spilling over
the dam, running too much water into the
upper canal, and that MID is taking
their share of water.

5.    As to the Tuolumne River, Power System
Operators must constantly maintain the
required flow in the Tuolumne River as
mandated by the Federal Energy
Regulatory Commission (FERC).

6.    Operators must (in coordination with
Energy Resources) assure that Turlock
Lake Reservoir is kept at the
appropriate elevation.

7.    Operators must keep Daily Logs of
Activities pertaining to line work,
canal flow changes, emergency generator
tests, clearances, red tags, breaker
operations (start/stop) on generating
units, transmission limits on major
paths (COI, Path 15, etc.), real-time
power purchases and sales, substation
maintenance, canal flow change requests,
and weather conditions.

8.    Economically schedule water and energy
resources

9.    Coordinate and evaluate water and energy
exchange transfers to determine most
economical arrangements.

(Doc. 31-2, Purdy Dec., filed August 7, 2006.)

    Avila and Souza also prepared a draft of a proposed 3-level

PCCOs and APCCOs Job Classification Draft where they outlined the

skills and experience required for their job.  According to the

document, the technical knowledge and experience required

includes:

1.  Knowledge of Clearances, operations, and safety requirements pertinent to irrigation and water distribution system operations, including irrigation flow concepts, system forecasting, power scheduling and accounting techniques, and concepts of the Tuolumne River flow control.

2.  Further, the experience required includes the ability to analyze irrigation flow data.

3.  Identify irrigation and scheduling problems and implement corrective action, develop real time water schedules and forecasts, economically schedule irrigation resources.

4.  Make correct decisions in emergency situations in the irrigation and distribution system, operate an irrigation & distribution system and direct work of irrigation & distribution system personnel.

(Doc. 31-3, Purdy Dec., filed August 7, 2006.)

The record includes a memo written from Avila and Souza containing their chart titled "Comparison of Duties Performed by Control Center Operators of Major California Utilities." (Doc. 31-4, Purdy Dec., filed August 7, 2006.)  This chart purports to show that PCCOs at TID perform additional duties more than PCCOs in other utility districts, including monitoring and controlling river flow (as indicated in column 10 of the chart) and monitoring and operating irrigation systems (as indicated in column 12 of the chart.)  (*Id.*)

Viewing the evidence in the light most favorable to the non moving party, the evidence is not disputable that Plaintiffs work "in connection with" the operation or maintenance of a ditch, canal, reservoir, or waterway in addition to their electrical power functions.  Summary adjudication as to this issue is

1  GRANTED.

2          **ii.   TID Canals or Waterways Used Exclusively for
                   Supply and Storing of Water, at Least 90 Percent
3                  Of Which Is Ultimately Delivered for Agricultural
                   Purposes.**
4
               **a.   Does The Word "Exclusively" Refer to the
5                     Supply and Storage of Water or to the
                      Ultimate Purpose for Which the Water was
6                     Delivered?**

7      At issue is whether the term "exclusively" refers to the

8  "supply and storing of water" or whether it refers to the

9  ultimate delivery of the water for agricultural purposes.

10     Before 1997 the section 213(b)(12) read:

11             Any employee employed in agriculture or in
               connection with the operation or maintenance
12             of ditches, canals, reservoirs, or waterways,
               not owned or operated for profit, or operated
13             on a sharecrop basis and which are used
               exclusively for supply and storing of water
14             ultimately delivered for agricultural
               purposes.
15
   *Dole v. West Extension Irrigation District*, 909 F.2d 349, 350
16
   (9th Cir. 1990).
17
       In 1997, Congress added the phrase "at least 90 percent of
18
   which was ultimately delivered for agricultural purposes during
19
   the preceding calendar year."  The statute exempts "Any employee
20
   employed in connection with the operation or maintenance of a
21
   waterway...used exclusively for the supply and storing of water,
22
   at least 90 percent of which was ultimately delivered for
23
   agricultural purposes during the preceding calendar year."  29
24
   U.S.C. section 213(b)(12).
25
       Plaintiffs argue that a narrow interpretation and plain
26
   meaning of the statute requires that section 213 (b)(12) be
27
   applied only to operation or maintenance of ditches, canals,
28

reservoirs, or waterways used exclusively for the supply and
storage of water and not for operation or maintenance of water
delivered or managed for other purposes.   Plaintiffs argue that
an alternative interpretation would unnecessarily broaden the
statute.[10]   Plaintiffs argue that the irrigation exemption does
not apply because (1) TID's waterways are not used exclusively
for the supply and storing of water for agricultural purposes and
(2) the waterways which are the subject of Plaintiffs' work are
used predominantly, if not exclusively for the generation of
electricity.

     The only case in the Ninth Circuit that addresses the term
"exclusive" in section 213(b)(12) is the pre 1997 amendment case
of *Dole v. West Extension Irrigation District*, 909 F.2d 349 (9th
Cir. 1990).   The issue in *Dole* was whether ditchrider employees
of Defendant District were exempt under section 213(b)(12).
There, three percent of the District's water was supplied for non
agricultural purposes.   The court read the word "exclusive" to
apply to the ultimate purpose for which the water was delivered.
Based on a plain reading of the pre-1997 statute, the court
reasoned that even if the amount of water supplied for non
agricultural purposes is very small, the exemption did not apply
to the ditchriders, as the doctrine of *de minimis* has no viable
place in the interpretation of FLSA.   *Dole*, 909 F.2d at 351.

     *Dole's* holding does not apply to the amended language of

---

[10]   In support of their position Plaintiffs rely on 29 C.F.R.
section 780.408 for their interpretation of the irrigation
exemption.   However, 29 C.F.R. 780.408 is an interpretation of
the pre-1997 language of the statute and is not instructive in
this case.

section 213(b)(12) as Congress expanded the exemptions' scope to cover agricultural irrigation which constitutes not less than 90 percent of the water stored and supplied by a waterway.  The 1997 amendment to section 213(b)(12) overrules *Dole's* strict construction.  In *Dole,* three percent of the water was supplied for non agricultural purposes, which supported the finding that the District's water use was not "exclusive" to agriculture and that the exemption did not apply.  After the 1997 amendment, Congress specifically defined the term "exclusive" in the statute to mean the dedicated irrigation water use up to 90 percent.

There is little guidance in the legislative history or in caselaw as to the Congressional intent in retaining the word "exclusive" in the 1997 amendment of the statute.  *Dole*, interpreted the term "exclusive" to limit water use to agricultural purposes.  This is consistent with a policy of narrowly interpreting statutory exemptions to application of the FLSA, to benefit the business of agriculture.  *Dole's* strict interpretation of the word "exclusive" must be harmonized with the apparent legislative objective of permitting a non profit water distribution entity to have some incidental "non agricultural" operations amounting to not more than ten percent of overall operations.  Under the canons of statutory construction, a statute should not be interpreted in such a way which renders other parts of the statute inconsistent or meaningless.  *See, United States v. Ray*, 375 F.3d 980, 999 (9th Cir. 2004)(*citing United States v. Powell,* 6 F.3d 611, 614 (9th

1  Cir. 1993).)[11]   To ignore the expansion of the agricultural

2  purpose exemption would read the amendment out of the statute.

3      In retaining the term "exclusive" while adding the more

4  expansive 1997 language, Congress expanded the term "exclusive"

5  in section 213 (b)(12) to mean that 90 percent, rather than 100

6  percent, of the water supplied and stored by the ditches, canals,

7  reservoirs, or waterways must be delivered for agricultural

8  purposes in the previous calendar year.   The 1997 amendments to

9  section 213(b)(12) expanded application of the exemption to

10  include non agricultural water operations up to ten percent

11  (10%).   For Defendants to carry their burden on summary judgment,

12  they must show quantitatively that not less than 90 percent of

13  TID's water was ultimately delivered for agricultural purposes in

14  the preceding calendar year.   The quantitative measure is the

15  volume of water in acre-feet or other pertinent unit of measure,

16  regularly used by irrigation service districts to quantify the

17  volume of their annual water storage and distribution operations.

18          **b.   Was At Least 90 Percent of TID's Water
               Ultimately Delivered for Agricultural**

19              **Purposes in 2005?**

20      There is little evidence offered by either party to permit

21  calculation of whether at least 90 percent of TID's water was

22

23  ───────────────

24      [11] The canons of statutory construction are tools designed
    to help courts better determine what Congress intended, not to

25  lead courts to interpret the law contrary to that intent.
    *Amalgamated Transit Union Local 1309 v. Laidlaw Transit Services*,

26  448 F.3d 1092, 1093-1094 (9th Cir. 2006); see also, *Chicksaw
    Nation v. United States*, 534 U.S. 84, 94 (2001)(the canons are

27  not mandatory rules but guides designed to help judges determine
    the Legislatures' intent, and other circumstances evidencing

28  congressional intent can overcome their force.)

31

ultimately delivered for agricultural purposes in 2005.

Plaintiff disputes the fact that more than 90 percent of water

stored and ultimately delivered by TID was for agricultural

purposes on the ground that they have not conducted sufficient

discovery to come to a conclusion on this issue.  (PSDF, no. 3.)

The record indicates the following:

1.   TID serves over 5,800 irrigation
     customers covering approximately 150,000
     acres of farmland. (Doc. 16, Kavarian
     Dec., Para. 3, filed July 12, 2006.)

2.   TID owns and operates more than 250
     miles of canals stretching from La
     Grange Dam on the Tuolumne River to the
     San Joaquin River.  (*Id.*)

3.   TID's irrigation and water delivery
     system begins at the District's Upper
     Main Canal Forebay Gates located at the
     La Grange Dam.  (Doc. 30, Martinez Supp.
     Dec., Para. 2.)

4.   The Upper Main Canal of TID's irrigation
     system is used exclusive for the
     delivery of water for irrigation
     purposes.  (Doc. 29, Hashimoto Dec.,
     Para. 3, filed August 7, 2006.)

However, the only facts in the record relevant to the quantities

of water ultimately applied to agricultural and non agricultural

purposes are found in the declaration of Michael Kavarian

("Kavarian"), TID's Supervising Engineering Technician.

Kavarian's declaration states:

1.   By reviewing TID's water receipts, the
     Supervising Engineering Technician can
     determine whether the water was
     ultimately delivered for agricultural or
     non agricultural purposes.  (Doc. 16,
     Kavarian Dec., Para. 8, filed July 12,
     2006.)

2.   From 2002 through 2005, more than 90
     percent of the water ultimately
     delivered by TID's water delivery system

32

was for agricultural purposes.  (*Id.* at
Para. 7)

3.    In 2005, TID ultimately delivered 97% of
the total water delivered for
agricultural purposes; only 3% of the
water ultimately delivered by TID in
2005 was for non agricultural purposes.
(*Id.* at Para. 14.)

These conclusory opinions do not show any foundational data for
the quantity of water in acre-feet or gallons, nor does the
opinion identify the nature and extent of non agricultural use to
permit verification of the opinion.  Viewing these facts in a
light most favorable to the non moving party the evidence does
not establish as a matter of law that at least 90 percent of the
water supplied by TID is supplied for agricultural purposes.
Defendant has not provided any evidence as to how water for
electric power generation is used and if it is available for
irrigation.  Summary Adjudication as to this issue is DENIED.

### 7.   CONCLUSION

For the reasons set forth above, Defendants' motion for summary
judgment is **GRANTED IN PART AND DENIED IN PART:**

- Summary adjudication as to the issue of whether Plaintiffs
work "in connection with" the operation or maintenance of a
ditch, canal, reservoir, or waterway is **GRANTED.**

- Summary adjudication as to the issue of whether at least 90
percent of the water supplied by TID is supplied for
agricultural purposes is **DENIED.**

- Summary adjudication that the 29 U.S.C. section 213(b)(12)
exemption applies is **DENIED.**

IT IS SO ORDERED.

**Dated:   November 27, 2006**          _____/s/ Oliver W. Wanger_____
dd0l0                                   UNITED STATES DISTRICT JUDGE

33